UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 20 CR 484 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| SAABEL CAUDLE, | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Saabel Caudle was indicted on December 7, 2020, for being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1), and for possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). Defendant moves to dismiss the case, or alternatively to bar any evidence of the alleged traffic violations that formed the basis of the routine traffic stop leading to Defendant's arrest on August 7, 2020. Having reviewed the parties' briefs and heard oral argument on the motion, the Court denies the motion to dismiss and/or alternative motion to bar introduction of evidence (ECF No. 70) for the reasons set forth below.

**I.  BACKGROUND**

On August 7, 2020, at approximately 8:04 p.m., two Chicago Police Department ("CPD") officers arrested Defendant. According to the officers' police report, Defendant committed the following traffic violations: 1) failing to stop at a stop sign at Drexel Avenue and 80th Street; 2) failing to stop at a stop sign at Maryland and 80th Street; and 3) failing to use a turn signal at Ingleside and 79th Street. (ECF No. 75-1.)[1] The officers' report states that upon approaching Defendant's vehicle, the officers smelled a strong odor of marijuana, and one officer observed a clear knotted plastic baggie in the driver's side door panel, which appeared to contain narcotics.

---

[1] The facts set forth in the officers' report are contested but are included here for background.

The report states that the officers requested Defendant exit the vehicle, whereupon one of the officers noticed a "large bulge in [Defendant's] right pants pocket." (*Id*.) The report states that during a protective pat down, the officer felt a hard object in Defendant's right pants pocket consistent with a weapon, and subsequently recovered a loaded .22 caliber Jennings Firearm Inc., Model J-22 pistol. Finally, the report states that the officers also recovered the clear knotted plastic baggie from inside the vehicle, which contained 14 individual pills of ecstasy, and 16 baggies of marijuana.

On August 10, 2020, Defendant was charged by Complaint with possession of a firearm by a felon, in violation of Title 18, United States Code, Section 922(g)(1). (ECF No. 1.) On August 20, 2020, a grand jury in the Northern District of Illinois charged Defendant by indictment, and on December 7, 2020, a grand jury charged Defendant by superseding indictment. The superseding indictment charged Defendant with being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1), and with possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). (ECF No. 26.)

The parties agree that Defendant sent a subpoena to CPD Records Services Division, which was received and served on September 3, 2020. The subpoena included a rider that requested, among other things, video recordings from Police Observation Device ("POD") cameras, red light cameras, and speed or other traffic cameras from August 7, 2020, from 7:30 p.m. to 8:30 p.m. at the following locations: 1) between 800 E. 80th Street and 900 E. 80th Street, Chicago, Illinois; and 2) between 7900 S. Ingleside and 8000 S. Ingleside, Chicago, Illinois. (ECF No. 70-1 at 6.) The cover letter to the subpoena stated in large, bolded and italicized font: "REQUEST FOR POTENTIALLY EXCULPATORY MATERIAL – DO NOT

2

DESTROY REQUESTED MATERIAL." (ECF No. 70-1 at 2.) The subpoena requested a return date of September 21, 2020.

On September 4, 2020, counsel for Defendant advised the prosecutor of the subpoena and purportedly emailed a copy to her. After Defendant's counsel became aware that the Court had not received any items requested in the subpoena, on January 5, 2021, he re-served the subpoena on the CPD.

On January 12, 2021, counsel for Defendant received an email from the Office of Emergency Management and Communications ("OEMC") stating that the subpoenaed video was not available because the cameras were past retention and were written over.[2] According to CPD directives, unless a request is made to save the footage, POD camera footage is overwritten 30 days after it is recorded.

On May 28, 2021, Defendant filed the instant motion to dismiss or bar evidence based on the destruction of video recordings, which Defendant argues violated the Due Process Clause or, alternatively, the Fourth Amendment's protection against unwarranted searches and seizures. Initially, Defendant argued that the subpoenaed video recordings would have shown that: 1) Defendant's vehicle stopped at the stop sign located at Maryland and 80th Street; 2) there is no stop sign for eastbound traffic at the intersection of Drexel and 80th Street; and 3) Defendant's vehicle activated its turn signal prior to turning at Ingleside and 79th Street.

After the instant motion was fully briefed, the Court directed the government to produce information regarding the cameras at issue. (ECF No. 82.) On September 7, 2021, the government filed the Affidavit of Christine Hood, a Program Analyst for the City of Chicago's Office of Public Safety Administration, which was formerly in the OEMC. (ECF No. 83.) Ms.

---

[2] OEMC is the agency that controls POD videos, and it is a separate agency from CPD.

Hood stated that there were no POD cameras at two of the three intersections, and that the POD camera located at Ingleside and 79th Street exists "but was offline on August 7, 2020." (*Id*. at 1.) POD cameras exist for crime prevention and are different from red light cameras. POD cameras rotate, and they may be controlled by an officer. If a POD camera upon inspection happens to be at the correct angle to capture criminal activity, an officer may record that fact and download the video footage into a case file. Officers do not typically rely on POD cameras for routine traffic stops.

After additional discovery regarding the POD camera at Ingleside and 79th Street and the OEMC's processing of Defendant's subpoena, the parties filed supplemental briefing. As it turns out, the POD camera at Ingleside and 79th Street was operational on August 7, 2020. Although Defendant's subpoena was served on CPD on September 3, 2020—three days before it was scheduled to be deleted—it was not "tasked" to OEMC until September 17, 2020. (ECF No. 97-1.) Consequently, the POD video was "not retained due to an inadvertent mistake caused by processing times over the Labor Day holiday weekend that was between when the subpoena was delivered and processed." (ECF No. 92.)

CPD receives approximately 1200 to 1500 subpoenas per week, and they are acted upon in the order they are received. It is possible to serve OEMC directly. If, like here, a subpoena is issued to CPD for video footage, CPD transfers it to OEMC for processing. At OEMC, there are two people assigned to search for and obtain material in response to subpoenas, and two people who input the information into the system.

## II. DISCUSSION

Defendant argues that the Government has violated his constitutional rights under both *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *Brady v. Maryland*, 373 U.S. 83 (1963). For the

4

reasons set forth below, Defendant fails to establish a constitutional violation under either standard, and Defendant's motion is denied.

### a. *Arizona v. Youngblood*

When a defendant alleges that "the government failed to preserve potentially exculpatory evidence, we apply the standard articulated in *Arizona v. Youngblood*, 488 U.S. 51 (1988)." *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011). To establish a *Youngblood* violation based on the destruction of potentially exculpatory evidence, Defendant must show (1) "that the government acted in bad faith," (2) "that the exculpatory nature of the evidence was apparent," and (3) "that the evidence could not be obtained elsewhere." *Tabb v. Christianson*, 855 F.3d 757, 768 (7th Cir. 2017); *see also McCarthy v. Pollard*, 656 F.3d 478, 486 (7th Cir. 2011).

Defendant argues that the *Youngblood* standard does not apply here, and that the Court should instead apply the standard set forth in *Brady* and its progeny, which does not require a showing of bad faith. Specifically, Defendant argues that *Youngblood*'s requirement of showing bad faith does not apply where the exculpatory nature of the evidence was apparent prior to its destruction.

The Government argues that when—as here—a defendant alleges that the government fails to preserve potentially exculpatory evidence, the *Youngblood* standard applies. The Court agrees. There is a difference "between those situations in which the police fail to disclose to the defendant evidence that it knows to be material and exculpatory, and those situations in which police simply fail to preserve potentially exculpatory evidence." *United States v. Kimoto*, 588 F.3d 464, 474–75 (7th Cir. 2009) (quoting *United States v. Chaparro–Alcantara,* 226 F.3d 616,

5

623 (7th Cir. 2000)). ³ Consequently, the Court applies the *Youngblood* standard and finds that Defendant fails to establish all three elements.

*First*, bad faith "requires more than carelessness"; rather, "it requires a 'conscious effort to suppress exculpatory evidence.'" *Fletcher*, 634 F.3d at 408 (quoting *Chaparro–Alcantara*, 226 F.3d at 624). Bad faith "requires proof of an 'official animus' … and necessarily turns on an official's subjective knowledge that the evidence in question had exculpatory value at the time it was lost or destroyed." *United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019) (quoting *United States v. Bell*, 819 F.3d 310, 318 (7th Cir. 2016)).

Defendant argues that if the *Youngblood* bad faith standard applies, then the OEMC's 30-day recycling policy, coupled with its lack of sufficient staffing when it knew of the amount of subpoena requests that would not be filed as a result, constitutes a pattern of "cavalier" behavior for evidence-preservation obligations that rises to the level of bad faith. (ECF No. 130 at 1.) Defendant points to the fact that 2,461 subpoenas for the period November 20, 2017 to December 9, 2020, were "past retention." (ECF No. 130 at 2.) Defendant does not indicate how many of those subpoenas were received after the 30-day retention policy had passed. Defendant nonetheless concludes that an individual charged with a crime would have to serve a subpoena on CPD less than eight days following the date of the incident requested—a protocol that he argues is set up to fail.

---

³ Defendant's arguments to the contrary notwithstanding, *California v. Trombetta*, 467 U.S. 479, 481 (1984), does not set forth a separate standard from *Youngblood*. *See McCarthy*, 656 F.3d at 484–85 ("[A]ccording to our precedent, *Trombetta* and *Youngblood* do not create two separate rules, with the former governing 'apparently' exculpatory evidence and the latter governing 'potentially' exculpatory evidence."); *Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992) ("[T]o demonstrate a due process violation under *Youngblood* and *Trombetta*, Petitioner must first show bad faith on the part of the government in the destruction of the sperm sample.").

6

Defendant also argues that his subpoena was served on CPD on September 3, 2000—within the 30-day period—but it was not tasked to OEMC until September 17, 2020. The Government's only explanation was that the POD video was "not retained due to an inadvertent mistake caused by processing times over the Labor Day holiday weekend that was between when the subpoena was delivered and processed." (ECF No. 92.)

The Court finds that the government's actions, while imperfect, do not rise to the level of bad faith.[4] *See United States v. Bell*, 819 F.3d 310, 318 (7th Cir. 2016) ("As to the video, the testimony indicated that the recording was taped over as a matter of routine, and nothing in the record casts the veracity of that testimony into doubt."); *Fletcher*, 634 F.3d at 407–08 ("As for showing bad faith, Fletcher demonstrates at best that the government may have been careless when officers failed to consider the possibility that potential trace evidence may have been useful to Fletcher's defense.").

The only video recording at issue is from the POD camera located at Ingleside and 79th Street, which Defendant contends would show that Defendant's vehicle properly activated its turn signal prior to turning. The individuals responsible for processing the subpoena were not the arresting officers. Those individuals were responsible for processing over 1200 subpoenas every week and there is no indication they knew the POD video existed or that it might contain exculpatory information. While 2,461 subpoenas for the period November 20, 2017 to December

---

[4] The following comment by the Seventh Circuit in *Holly* applies here: "To be sure, the failure of the police to preserve the video is unfortunate. Mistakes happen, though, and that is all we can say occurred here. But in closing it does seem prudent to offer the limited observation that CPD would do well to revisit its preservation protocol—all to protect the interests of CPD itself, citizens, and those like Holly who find themselves charged with crime." *United States v. Holly*, 940 F.3d 995, 1002 (7th Cir. 2019).

9, 2020, were past retention, there is simply no indication how many of those subpoenas were received after the 30-day retention policy had passed.

Further, there is no indication that the POD video at issue captured the actions of Defendant's vehicle at Ingleside and 79th Street. POD cameras exist for crime prevention and are different from red light cameras. POD cameras rotate, and they may be controlled by an officer. If a POD camera upon inspection happens to be at the correct angle to capture criminal activity, an officer may record that fact and download the video footage into a case file. Officers do not typically rely on POD cameras for routine traffic stops. Here, there is no indication that the arresting officers did so, or that they had any reason to believe that CPD maintained any videos capturing the relevant events or that any such videos contained exculpatory evidence. Rather, the officers were on patrol when they allegedly observed someone commit traffic violations and pulled the vehicle over.

Finally, CPD was served with Defendant's subpoena on September 3, 2020—just prior to Labor Day weekend, and three days before the POD video was scheduled to be deleted on September 6 as a matter of course. While the subpoena was not tasked to OEMC until two weeks later, there is nothing indicating official animus. Defendant's subpoena requested a return date of September 21, 2020, and there was nothing on its face that indicated it needed to be processed immediately. The video footage was apparently destroyed pursuant to CPD's routine destruction timeline.

*Second*, the "exculpatory nature of the evidence" must have been "apparent before its destruction." *Fletcher*, 634 F.3d at 407. The only POD video recording at issue was from the intersection of Ingleside and 79th Street, which Defendant contends would show that Defendant's vehicle properly activated its turn signal prior to turning. Defendant contends that

8

the information would be immediately apparent on the videotaped footage and require no analysis as to whether it was exculpatory.

For the reasons stated above, however, there is no indication that the POD video captured the actions of Defendant's vehicle. There is no indication that the arresting officers viewed the POD video footage at issue, or even knew it existed at any point. Moreover, the POD video at issue here would have only depicted one intersection, while any one of the three alleged traffic violations would form the basis for a proper traffic stop. Consequently, there is no indication that any exculpatory nature of the evidence was apparent before its destruction. *See, e.g.*, *Fletcher*, 634 F.3d at 408 ("Nothing … suggests the government actually knew beforehand that exculpatory 'trace' evidence may have been on the seized items—this conclusion is buttressed by the fact that the record still fails to support the notion that such trace evidence would have exonerated Fletcher.").

*Third*, Defendant argues that the purportedly exculpatory information subpoenaed—the POD camera located at Ingleside and 79th Street purportedly showing that Defendant's vehicle properly activated its turn signal prior to turning—is not readily available from another source. Namely, Defendant argues that the officers' BWC's did not capture video footage of the alleged traffic violation and there are no other witnesses listed other than the two arresting officers and Mr. Caudle as to the alleged traffic violation.

The Court disagrees—Defendant can present other evidence that he did not commit the traffic violation alleged.[5] For example, Defendant can question the officers involved during an evidentiary hearing and call their observations into question.

---

[5] The Court further notes that Defendant can present evidence that he did not commit the two other traffic violations alleged at the two intersections without POD cameras. The presence, or lack thereof, of a stop sign at the intersection of Drexel and 80th Street can be established

9

Because Defendant fails to meet each prong of the *Youngblood* standard, his motion to dismiss is denied.

### b. *Brady v. Maryland*

Defendant argues in the alternative that the Court should grant his motion to dismiss or bar evidence based on the government's failure to obtain and disclose the subpoenaed video recording under *Brady v. Maryland*, 373 U.S. 83 (1963). "[T]o establish a *Brady* violation, the defendant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the Government, either willfully or inadvertently; and (3) the denial was prejudicial." *Kimoto*, 588 F.3d at 474 (quoting *United States v. Roberts*, 534 F.3d 560, 572 (7th Cir.2008)). "The standard for materiality is whether there is 'a reasonable probability' that the outcome would have been different if the evidence had been disclosed." *United States v. King*, 910 F.3d 320, 327 (7th Cir. 2018) (quoting *United States v. Walter*, 870 F.3d 622, 629 (7th Cir. 2017)). The defendant bears the burden of establishing a *Brady* violation but cannot show a violation based on "mere speculation" or "unsupported assertions that the government suppressed evidence." *United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010) (quoting *United States v. Driver*, 798 F.2d 248, 251 (7th Cir. 1986)).

The parties disagree as to whether the POD video was favorable and material. Defendant argues that the POD video recording of the intersection of Ingleside and 79th Street would be favorable and material to Defendant because it would show that Defendant's vehicle signaled before turning, which in turn would demonstrate that two of the three purported bases for the

---

through testimony, pictures of the street, Chicago Department of Transportation records, or testimony of a resident of that street, for example. Defendant can also question the officers involved during an evidentiary hearing and call their observations into question.

traffic stop were not accurate and thus make the officer's testimony about the third purported moving violation (failure to stop at the stop sign at Maryland and 80th Street) less credible. Defendant's argument is premised on the claim that he can establish that there is no stop sign on eastbound Drexel and 80th Street, attaching a Google view screenshot to his motion purportedly showing the lack of a stop sign. However, the Government counters that the Google view screenshot attached to Defendant's motion appears to show a stop sign, and regardless was not taken on the date and time in question. Whether there was a stop sign on eastbound Drexel and 80th Street on August 7, 2020, thus remains contested.

Defendant merely speculates that the POD video at issue would have contained favorable evidence. For the reasons stated above, it remains unknown whether the POD video was positioned at the intersection at an angle that captured the actions of Defendant's vehicle, or whether it was positioned to show Defendant's use of a turn signal at or around the time of the sunset.[6] Due to the speculative nature of the POD video, Defendant also fails to establish that it is material. Materiality requires "reasonable probability that the outcome would have been different if the evidence had been disclosed." *King*, 910 F.3d at 327 (internal quotation omitted).

Because Defendant fails to establish that the destroyed POD video footage was favorable and material, his alternative motion to dismiss or bar evidence under *Brady* is denied.

### III. CONCLUSION

For the reasons set forth above, the Court denies Defendant's motion to dismiss or alternatively to bar introduction of evidence [70].

---

[6] Defendant was arrested at approximately 8:04 p.m. on August 7, 2020. Sunset occurred at approximately 8:01 p.m. that day in Chicago, Illinois. (ECF No. 98 at 5 n.4.)

**SO ORDERED.**  **ENTERED: January 4, 2023**

_____
**HON. JORGE ALONSO
United States District Judge**